**LAWRENCE G. WASDEN**
**ATTORNEY GENERAL**

**MICHAEL J. KANE**
**SPECIAL DEPUTY ATTORNEY GENERAL**
**MICHAEL KANE & ASSOCIATES, PLLC**
4355 West Emerald Street, Suite 190
Post Office Box 2865
Boise, Idaho 83701-2865
Telephone:  (208) 342-4545
Facsimile:  (208) 342-2323
Email:  mkane@ktlaw.net
Idaho State Bar No. 2652

ATTORNEYS FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIELLE DORSCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:17-cv-00428-BLW |
| vs. | ) |
| | ) DEFENDANTS' |
| STATE OF IDAHO DEPARTMENT OF FISH | ) MOTION IN LIMINE |
| AND GAME, a political subdivision of the | ) RE RECORDINGS AND |
| State of Idaho; JOHN/JANE DOES I through X | ) SCOPE OF CLAIMS AND |
| whose true identities are presently unknown; | ) MEMORANDUM IN SUPPORT |
| | ) |
| Defendants. | ) |
| | ) |

COMES NOW the Defendant, STATE OF IDAHO DEPARTMENT OF FISH AND

GAME ("IDFG"), by and through its attorney of record, Michael J. Kane, of the firm Michael

Kane & Associates, PLLC, and herein moves the Court to render the evidentiary orders as

delineated in the following Memorandum in Support of Defendant's Motion in Limine.

# I.

## STANDARD OF REVIEW

As succinctly explained in Miller *v. Lemhi Cty.*, No. 4:15-CV-00156-DCN, 2018 WL

1144970 (D. Idaho Mar. 2, 2018):

> Motions in limine are well-established devices that streamline trials and settle
> evidentiary disputes in advance, so that trials are not interrupted mid-course for
> the consideration of lengthy and complex evidentiary issues." *United States v.
> Tokash*, 282 F.3d 962, 968 (7th Cir. 2002). "The term 'in limine' means 'at the
> outset.' A motion in limine is a procedural mechanism to limit in advance
> testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d
> 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).
>
> Because "[a]n in limine order precluding the admission of evidence or testimony
> is an evidentiary ruling," *United States v. Komisaruk*, 885 F.2d 490, 493 (9th Cir.
> 1989) (citation omitted) "a district court has discretion in ruling on a motion in
> limine." *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in
> limine rulings are preliminary and, therefore, "are not binding on the trial judge
> [who] may always change his mind during the course of a trial." *Ohler v. United
> States*, 529 U.S. 753, 758 n.3 (2000).

*Miller v. Lemhi Cty.*, 2018 WL 1144970, at *1.

# II.

## RECORDINGS

Plaintiff spent dozens of hours recording her coworkers after a significant fish mortality

event and a warning letter given to her in April of 2015. At least five (5) of those recordings

were felonious, in that she was not a party to the conversation. As to the "legal" recordings,

Plaintiff has provided what in many cases were partial recordings. These recordings often start

or end in the middle of a conversation   In addition to the complex legal issues raised by the

recordings and the methods of recording, Plaintiff also seeks to assert that it was a hostile event

when she was instructed to cease recording. This motion will focus upon the evidentiary issues

raised as to the recordings that should be ruled upon prior to trial.

A.    **The Illegal Recordings.**

So far, five recordings (or portions thereof) made by Plaintiff in the workplace are clearly identified as illegal.  These are:

1.    A recording of a conversation between Hatchery Manager Doug Engemann (hereinafter "Engemann") and Assistant Manager Brandon Filloon (hereinafter "Filloon") that Plaintiff has designated as "Talking about my schedule time off and manager Doug mentions the 200-Volt extension cord."  Plaintiff admits she was not a party to the conversation. (See pertinent portions of the September 24, 2018, *Deposition Transcript of Danielle Dorsch* (hereinafter "Dorsch Depo. Vol. I"), pp.180-186, attached as Exhibit A to the *Affidavit of Michael Kane in Support of Motion in Limine* (hereinafter "Kane Affidavit"));

2.    A recording of a conversation between Hatchery Manager Engemann and Assistant Manager Filloon that Plaintiff has designated as "Comments Doug Made Not the Right Tool."  Plaintiff admits she was not a party to the conversation.  Indeed, she was not even in the same portion of the building, and was behind closed doors.  (Kane Affidavit, Dorsch Depo. Vol. I, pp.191-192 and 194-195);

3.    A recording of conversations among Engemann, Brandon Filloon and Fish Technician Leah Schultz that Plaintiff has designated as "4-6-15."  Plaintiff admits she was not a party to a portion of the conversation. (See pertinent portions of the June 9, 2019, *Deposition Transcript of Danielle Dorsch* (hereinafter "Dorsch Depo. Vol. II"), p.368, attached as Exhibit B to the *Affidavit of Michael Kane in Support of Motion in Limine* (hereinafter "Kane Affidavit"));

4.    A recording of Engemann, Filloon and Bryan Grant that Plaintiff has designated as "New Recording 5."  Plaintiff admits she was not a party to a portion of the recorded conversation. (Kane Affidavit, Dorsch Depo. Vol. II, pp.415-416); and,

5.      A recording of Engemann speaking into a telephone, followed by a conversation between Engemann and Fish Technician Jacob Rook that Plaintiff has designated as "Feeding Fish 1_30."  Plaintiff admits she was not a party to the conversation, although she has no memory about why the recording was made. (Kane Affidavit, Dorsch Depo. Vol. II, pp. 455-456).

For ease of reference, the recordings will be referred to by the above numbers rather than the cumbersome and artificial designations of Plaintiff.

Plaintiff used Recording 1 to bring a claim against Engemann to the Department's Human Resources division, stating that Engemann had tried to strangle her or otherwise threaten her life and claiming the illegal recording was "evidence."   She has continued to make the assertion that her life was threatened, even as late as her deposition of June 19, 2019.  (Kane Affidavit, Dorsch Depo. Vol. II, p.369).  As to Recording 2, there is a short conversation in which Mr. Engemann laments that Plaintiff is not the right tool he needed at that time and that he wished her former supervisor had "grown a pair" about her incompetence.   The other three recordings contain nothing Plaintiff has identified as evidence of bias, or hostile work environment.   These recordings are inadmissible as a matter of federal and state law and in fact are evidence of criminal misbehavior on the Plaintiff's part.

The federal wiretap and eavesdropping law is found at 18 U.S.C. §§ 2501, *et seq*.  It prohibits interception and recording of oral communications unless such person is either a party to the communication or one of the parties to the communication has given prior consent to such interception.   18 U.S.C. §§ 2511(c).  The consequence for unlawfully intercepting an oral communication is that, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial."   18 U.S.C. § 2515.

Idaho tracks the federal law in that it requires at least one party to consent to the interception and provides that "no evidence derived therefrom may be received in evidence in any trial" as well. *See*, Idaho Code §§ 18-6702(d) and 18-6705.

The phrase "oral communications" is defined by 18 U.S.C. § 2510(2) as requiring that the person uttering the oral communication exhibits an expectation that such communication is not subject to interception under circumstances justifying such expectation. In other words, did the conversant have an expectation of privacy in his conversation?

A "reasonable expectation of privacy" has not been conclusively announced by the Ninth Circuit Court of Appeals with regard to questionable recordings of conversations. However, Ninth Circuit lower courts have cited *Kee v. City of Rowlett*, 247 F.3d 206 (5th Cir. 2001), when determining whether an individual had a reasonable expectation of privacy in his oral communications that was intercepted (usually by law enforcement).

*Kee* reviewed the legislative history of the federal wiretapping and eavesdropping law. The history revealed that the statutes were discussed and crafted in light of the United States Supreme Court case of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Katz*, the individual was using a public telephone booth to make illegal wagers. FBI used surveillance equipment to record one side of the conversations without securing a warrant.

The Supreme Court determined that the Fourth Amendment protected people, not places and the question really was whether Mr. Katz had a reasonable expectation of privacy when he closed the door to the telephone and began making his call.

The *Kee* court looked at the *Katz* decision and created a list of things to consider when determining whether a conversant has a reasonable expectation of privacy in his oral communications. They are: (1) the volume of the communication or conversation; (2) the proximity or potential of other individuals to overhear the conversation; (3) the potential for

communications to be reported; (4) the affirmative actions taken by the speakers to shield their privacy; (5) the need for technological enhancements to hear the communications; and (6) the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating. *Kee v. City of Rowlett*, 247 F.3d 206, 213-15.

Affidavits are filed contemporaneously with this brief to demonstrate that the speakers were in expectation that their conversation would be private. It is axiomatic that these five recordings should be held to be inadmissible. However, that does not end the analysis.

**B.   Fruit of the Poisonous Tree.**

One of the central pillars of Plaintiff's claim since she approached Department Human Resources in 2015 has been that Mr. Engemann threatened to strangle or otherwise kill her. Although the most cursory review of the recording will not substantiate this, Plaintiff has continued to pound this drum relentlessly. (See her claim to the Idaho Human Rights Commission (Kane Affidavit, Exhibit C) and her deposition testimony (Kane Affidavit, Dorsch Depo. Vol. I, pp.180-186 and Vol. II, p.369)).

When pressed, Plaintiff is forced to admit that she was not in fact physically threatened. (Kane Affidavit, Dorsch Depo. Vol. I, pp.77-79). Yet, unless prevented by this court, it appears that Plaintiff's game plan is to make this assertion to the jury. Perhaps realizing the porousness of her position, Plaintiff appears now to claim that she was simultaneously eavesdropping and intends to attempt to parrot the conversation. The problem with this is that she cannot accurately state what the conversation was. (Kane Affidavit, Dorsch Depo. Vol. I, pp.181-184). This was even after she admitted to listening to the conversation the same day as her deposition. (Kane Affidavit, Dorsch Depo. Vol. I, p.178). Further, she admits she did not hear Brandon Filloon's portion of the conversation. (Kane Affidavit, Dorsch Depo. Vol. I, p.182). And she admits that her conflation of what was said into a threat was her assumption of what Engemann was

physically gesturing even though she was hiding around a corner and did not see him doing anything. (Kane Affidavit, Dorsch Depo. Vol. I, pp.183-184).

The Court should determine that Dorsch is prevented from testifying concerning her "eavesdropping" because it is clear that her recollection is based upon evidence which is prohibited and as such is barred by 18 U.S.C. § 2515 and Fed.R.Evid. 402 as evidence derived from the unlawful recording.

*Gelbard v. United States*, 408 U.S. 41, 92 S. Ct. 2357 (1970), extensively reviewed the wiretapping and electronic surveillance legislative history. While the focus was clearly the prohibition of unlawful government interception of private conversations, the Senate committee report made it clear that not only the recording should be excluded, but evidence derived therefrom based upon the overarching importance of protecting privacy of individuals. As the *Gelbard* court noted language contained in the Senate Report:

> 'Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited. . . . Only by striking at **all aspects** of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings. Each of these objectives is sought by the proposed legislation.' S.Rep.No.1097, supra, at 69; U.S.Code Cong., & Admin.News, p. 2156 (emphasis added.)

*Gelbard v. United States*, 408 U.S. 41, 50, 92 S. Ct. 2357, 2362 (1970) (additional emphasis added).

Thereafter, the *Gelbard* court described the importance of section 2515 in prohibiting not only the intercepted oral communication, but evidence derived therefrom, saying:

> Moreover, section 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the

evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings'.  (internal citations omitted)

*Gelbard v. United States*, 408 U.S. at 51, 92 S. Ct. at 2362, 2363.

If all of the above is not enough to bar Plaintiff from exploiting the illegal recording, there is the fact that she has not produced all of it.  Although there is nothing on the recordings that demonstrate that Plaintiff's claims are valid, it is concerning that Plaintiff has had the opportunity to delete, withhold or lose recordings that could be favorable to the Department.  When queried about whether there are more recordings or more complete recordings, Plaintiff's stock answer has been, "My lawyer has everything."  (Kane Affidavit, Dorsch Depo. Vol. II, pp.331-333).

Based upon Plaintiff's sworn testimony, it is clear that Plaintiff has either lost or destroyed evidence or withheld it in discovery as to the illegal recording designated as Recording 1.  Plaintiff has asserted under oath that the recording she gave Human Resources was only part of a more complete recording, and that she only sent Human Resources what she thought was pertinent.  (Kane Affidavit, Dorsch Depo. Vol. I, pp.184-187).  Yet regarding Recording 1, nothing further has been disclosed in discovery, despite assurances from Plaintiff that the Department has been given everything.  While Plaintiff's actions may or may not rise to the level of actionable spoliation, they are certainly egregious enough for the court to determine that she should not be rewarded by being allowed to present the comment to the jury as if it was a threat.

In short, Plaintiff should not be allowed to capitalize on her illegal recording when, (1) she cannot accurately state what the conversation was, (2) saw nothing, (3) purportedly heard only a part of the conversation, (4) admits she was assuming what was meant, and (5) has not produced the full recording.  The court is asked to instruct the Plaintiff to refrain from asserting that she was threatened in any way, and refrain from referencing the conversation in any way.

C.      **The Instruction to Cease Recording.**

A second pillar of Plaintiff's claim against the Department is that she was instructed to cease recording her coworkers.   In the instruction, the illegal recording (Recording 1) was mentioned as one of the reasons for the instruction.   Later, a policy was adopted to the effect that recording coworkers was not in keeping with a respectful workplace.  Plaintiff asserts that the instruction is proof of retaliatory conduct and proof of gender bias, asserting that she was deprived of the ability to "gather evidence."

This court has already ruled that the instruction to stop recording is not actionable as retaliation or a discriminatory act.   See *Memorandum Decision and Order* (Dkt.25), dated January 8, 2019.  The question then is whether the instruction to stop recording, the later adopted policy, or the decision-making regarding the delivery of the instruction and adoption of the policy is relevant to Plaintiff's hostile work environment and constructive discharge claim.  The Department asserts that any aspect of the instruction to stop recording is inadmissible for a variety of reasons, and requests the court to prevent testimony from Plaintiff on the subject.

To begin, it should be remembered that a gender discrimination case based upon a claim of hostile work environment or constructive discharge must have certain elements.   Primary among those elements is a "sexual component" of some kind, described by the courts as slurs, insults, jokes or other verbal comments or physical contact or intimidation of a sexual nature, sexual advances, requests for sexual conduct, or other verbal or physical conduct of a sexual nature.  (*See* Ninth Circuit Model Civil Instruction 10.5).  Without such a component, an action by management (albeit bothersome to a Plaintiff) is simply not relevant.  On their faces, the two documents have nothing whatsoever to do with gender.  Although Plaintiff will probably assert that she felt she was being picked on because she was a woman, Title VII cases cannot be based upon management decisions regarding general personnel activities.   The Ninth Circuit has

explained that "harassment" "consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) (quoting *Reno v. Baird*, 18 Cal. 4th 640, 647 (1998)). "[C]ommonly necessary personnel management actions such as hiring and firing, job or project assignments,...promotion or demotion, [and] performance evaluations,...do not come within the meaning of harassment. *Id.* (quoting *Reno*, 18 Cal. 4th at 646-47) (omissions in original).

Nor can Plaintiff claim that she had a right to record to "gather evidence."  No court has approved of conduct similar to the disrespectful and intrusive behavior of Plaintiff.  Indeed, the courts that speak to the issue are squarely against such conduct.  To quote one federal court, "private talk in public places is common." *Veritas Action Fund v. Conley*, 244 F.Supp.3d 256 (D. Mass. 2017).

> Individuals have conversations they intend to be private, in public spaces, where they may be overheard, all the time—they meet at restaurants and coffee shops, talk with co-workers on the walk to lunch, gossip with friends on the subway, and talk too loudly at holiday parties or in restaurant booths. These types of conversations are ones where one might expect to be overheard, but not recorded and broadcast. There is a significant privacy difference between overhearing a conversation in an area with no reasonable expectation of privacy and recording and replaying that conversation for all to hear. See *Alvarez*, 679 F.3d at 605–06 (recognizing that the First Amendment permits greater protection for conversational privacy than for the public conversations of public officials); see also *State v. O'Brien*, 774 A.2d 89, 96 (R.I. 2001) ("Although we may expect individuals with whom we are communicating to hear and even to remember what we are saying (and perhaps how we have said it), we usually do not expect them to acquire surreptitiously an exact audio reproduction of the conversation that they can later replay at will for themselves or for others.").

*Veritas Action Fund v. Conley*, 244 F.Supp.3d at 264.

> Failure to report harassment because of a generalized fear of retaliation or belief in the futility of reporting harassment deprives the employer of an opportunity to take corrective action and does not justify the failure to report or the decision to gather evidence by recording workplace interactions.

*McKinney v. G4S Government Solutions, Inc.*, 711 F. App'x. 130, 137 (4th Cir. 2017).

Nor can the instruction and the later adoption of policy be reasonably described as "sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a sexually abusive or hostile work environment." (*See* Ninth Circuit Model Civil Instruction 10.5). Harassment must be such that the workplace is permeated with discriminatory intimidation, ridicule, and insult before Title VII is implicated. *Harris v. Forklift Systems*. 510 U.S. 17, 114 S.Ct. 367 (1993).

Nor is it reasonable for Plaintiff (who resigned some seven months after being instructed not to record) to attempt to use the instruction as evidence of working conditions so intolerable that reasonable person would have felt compelled to resign. See *Pennsylvania State Police. v. Suders*, 542 U.S. 129,124 S.Ct. 2342 (2004).

In short, the decisions by upper management to require Plaintiff (and everyone else in the agency) to stop recording coworkers' conversations are non-issues and Plaintiff should not be allowed to insinuate otherwise to the jury by asserting that the managerial decisions are evidence of gender discrimination or hostile working conditions.

### D.    **Requested Rulings.**

The Department requests the following rulings prior to trial: (1) that the five recordings are inadmissible; (2) that Plaintiff be prevented from asserting that she had her life threatened or that she refer to Recording 1 or her alleged eavesdropping in any way; (3) that Plaintiff be prevented from referring to the instruction to stop recording her coworkers or to the later policy amending the respectful workplace rules in any way.

## III.

## THE SCOPE OF PLAINTIFF'S CLAIMS

### A.      Retaliation.

This court has previously ruled that the only retaliatory claim left to Plaintiff is the DNA rating she received in September of 2015, limiting that claim to state law only.  Obviously, any claim of retaliation supposedly occurring prior to that time is time barred.  The reason for the supposed retaliation is articulated in the Complaint as resultant from reporting and participating in investigations of allegations of hostile work environment.  The only examples referenced in the Complaint as to retaliation are "poor performance ratings" and the instruction not to record.

It appears that Plaintiff, unless prevented by the court, intends to assert a sweeping claim of retaliation, encompassing every event she considers negative in any way, by any person employed by Fish and Game.

> I believe that the Department, once I complained, made the complaint, I felt I was being discriminated against by Chris Jeszke and Gary Byrne.  And after that point I wasn't given promotions.  I wasn't given lateral transfers.  I wasn't given the same opportunity as my male, other fish culturists at the time.

(Kane Affidavit, Dorsch Depo. Vol. I, p.93, ln.20, to p.94, ln.1).  "I'm saying that when I reported to HR, that is when it seemed like I had a target on my back."  (Kane Affidavit, Dorsch Depo. Vol. I, p.228, ln.20-21).  In the context of the problem solving experience after the DNA, "I think the department retaliated."  (Kane Affidavit, Dorsch Depo. Vol. I, p,158, ln.8).

In order to avoid misleading the jury, Plaintiff must be prevented from making these sort of sweeping generalities in the context of retaliation.

### B.      Disparate Treatment.

Similar to the glittering generality about being retaliated against, Plaintiff has a continuing assertion that she was treated "differently."  This sense of being treated differently

goes back to her earliest days at Fish and Game.   (Kane Affidavit, Dorsch Depo. Vol. I, pp.13, 30-31, 33-34 and 86-87).

In a similar fashion, Plaintiff conflates her own experiences with systemic anti-female bias.  Plaintiff has been asked to identify what she considers to be sexually related comments during her term at Fish and Game.  She has identified very few, ranging over a period of seven years.  One of these is a comment (women do not belong in hatcheries) by Assistant Manager Mel Hughes, allegedly happening at the Sawtooth Hatchery in 2008.  It is notable that Plaintiff brought this comment up in the context of questions about her failed promotional opportunity that occurred six years later in 2014.   In doing so, Plaintiff asserts this single comment proves systemic cultural anti-female bias throughout Fish and Game. (Kane Affidavit, Dorsch Depo. Vol. I, pp.60-63).  This "good old boy system" was there "all along" since June of 2008.  (Kane Affidavit, Dorsch Depo. Vol. I, p.113, ln.5,, to p.116, ln.1).

To establish a *prima facie* case of disparate treatment, a plaintiff must demonstrate that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."  *Best v. California Dep't of Corr.*, 21 F. App'x 553, 558 (9th Cir. 2001).  If the plaintiff establishes a prima facie case, the defendant then has the burden to "articulate nondiscriminatory reasons for the allegedly discriminatory conduct.  The employer's articulation of a facially nondiscriminatory reason shifts the burden back to the plaintiff to show that the employer's reason was a pretext for discrimination." *Id.*  (internal citations omitted).  More specifically, a plaintiff must prove by a preponderance of the evidence that her gender was either the sole reason or a motivating factor for the employer's decision to not laterally transfer or promote her. (*See* Ninth Circuit Model Civil Instructions 10.1, 10.2 and 10.3).

This is not a disparate treatment case, in that the various attempts at lateral transfer and promotion are time barred. Plaintiff has provided no discovery as to any other sort of disparate treatment occurring within the time limitations under state and federal law. In order to avoid misleading the jury, Plaintiff must be prevented from making these sweeping generalities in the context of being treated "differently."

Similarly, Plaintiff should be prevented from presenting to the jury her private theories about systemic bias against women within the Department. A *prima facie* case of an employer's system wide pattern or practice of disparate treatment requires a plaintiff to "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. [A plaintiff] ha[s] to establish by a preponderance of the evidence that…[the] discrimination was the company's standard operating procedure…rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 334–36, 97 S. Ct. 1843, 1854–55, 52 L. Ed. 2d 396 (1977).

The Ninth Circuit reiterated the Supreme Court's finding, stating that, "[a]s the Supreme Court explained, pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace." *Cherosky v. Henderson*, 330 F.3d 1243, 1246–47 (9th Cir. 2003). The court also noted that in order to demonstrate pattern-or practice claims, plaintiffs typically use statistical evidence to demonstrate such claims. *Id*.

Systemic bias is not even mentioned in the Complaint, and Plaintiff has given the Department nothing by way of discovery that meets the legal test for a trial on the subject.

**C.    Hostile Work Environment Claim.**

Hostile work environment claims involve "repeated conduct" versus "discrete acts" and therefore do not occur on any one specific day. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S. Ct. 2061, 2073, 153 L. Ed. 2d 106 (2002). Instead, such conduct "occurs over a

series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment

may not be actionable on its own...[s]uch claims are based on the cumulative effect of individual

acts" *Id*. At 115.  In analyzing hostile work environment claims, courts consider the frequency

of the conduct, the severity of the conduct, whether the conduct is physically threatening or

humiliating, or a "mere offensive utterance".  *Id*. at 116-17.

> A hostile work environment claim is composed of a series of separate acts that
> collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–
> 5(e)(1)…
> …. A court's task is to determine whether the acts about which an employee
> complains are part of the same actionable hostile work environment practice, and
> if so, whether any act falls within the statutory time period.

*Id*. at 116-17, 120-21 (internal citations and footnotes omitted).

In *Baird v. Gotbaum,* the court discussed *Morgan*, stating that:

> The *Morgan* principle is not, however, an open sesame to recovery for time-
> barred violations. Both incidents barred by the statute of limitations and ones not
> barred can qualify as "part of the same actionable hostile environment claim" only
> if they are adequately linked into a coherent hostile environment claim—if, for
> example, they "involve[ ] the same type of employment actions, occur[ ]
> relatively frequently, and [are] perpetrated by the same managers." *Morgan,* 536
> U.S. at 120–21, 122 S.Ct. 2061.

*Baird v. Gotbaum*, 662 F.3d 1246, 1251–52 (D.C. Cir. 2011).

The Ninth Circuit analyzed a hostile work environment claim in which a female

correctional officer ("Porter") filed a claim against the California Department of Corrections.

According to Porter, the Department violated Title VII of the Civil Rights Act because of

continuing sexual harassment, discrimination and retaliation after she rejected sexual advances

by two other correctional officers.  *Porter v. California Dep't of Corr.*, 419 F.3d 885, 887 (9th

Cir. 2005).  The court noted that:

> [T]o determine whether all of these events constitute "one unlawful employment
> practice," we consider whether they were "sufficiently severe or pervasive," and
> whether the earlier and later events amounted to "the same type of employment

> actions, occurred relatively frequently, [or] were perpetrated by the same
> managers."
>
> Analyzing the more recent allegations first, there is nothing to suggest that Ford's
> statements or the insults hurled by unnamed officers were sexually charged, or
> that these statements would not have been directed toward Porter if she was a
> man. Likewise, there is no evidence linking these comments and contumelies to
> the actions of Wheeler or DeSantis. Thus, the messages dispatched to Porter by
> Ford and the unnamed officers are not connected to the same hostile-environment
> practice as the conduct ascribed to Wheeler and DeSantis. Moreover, standing by
> themselves, these statements are not sufficiently severe or pervasive to support a
> hostile-environment claim.

*Id.* at 892-93 (internal citations omitted).  In another case, an employee working at a printing company claimed that when she was working in the production department, she "was regularly exposed to sexual comments, sexually explicit matters, sexual jokes, hostile [and] vulgar language, sexual [innuendos] and gross behaviors, primarily by male coworkers, including management" despite "[c]ontinual complaints to management."  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 72–74 (2d Cir. 2010).  McGullam was granted a transfer to a position in the estimating department which was on the other side of the building.  After the transfer, McGullam complained of another incident, stating that:

> While working in the estimating department, I was away from the majority of the
> harassment, hostility and aggravation. However, all comments of a sexual and
> derogatory nature did not cease entirely. On the opposite side of my cubic [le]
> wall was a salesman ... [who] carried on numerous lengthy conversations with
> male buddies and made frequent comments about women such as referring to
> them as "chickies[."] He also remarked that "[i]f it wasn't going to be a sleep-
> over, she wasn't worth the trip[,"] regarding a woman friend that he was involved
> with (translating to: she's only worth the trip if I'll be getting sex). This was a
> thoroughly demeaning comment regarding women.

*Id.* at 73-74.

Due to the applicable limitations period, only the "chickies comments" and the "sleep-over comment" could be considered in McGullam's hostile work environment claim.  *Id.* at 76. The court found the "chickies comments" were "too trivial to contribute to a Title VII hostile work environment claim. They were not obscene or lewd, or even sexually suggestive. Even if

the chickies comments could be deemed unrefined or uncivil, Title VII simply "does not set forth a general civility code for the American workplace.'" *Id*. (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

With respect to the sleep-over comment, because it was determined to have occurred within the applicable time period, the court analyzed whether it "sufficiently related to the production department conduct to be part of the same alleged hostile work environment practice." *Id*. at 77. In finding that it was not, the court noted:

> In this case, the sleep-over comment is insufficiently related to the production department conduct chiefly for two reasons. First, Cedar Graphics transferred McGullam (at her request) from the production department, where she experienced harassment, to the estimating department, which was a different environment in material respects—and in a different sector of the building. *See Morgan,* 536 U.S. at 118, 122 S.Ct. 2061 (recognizing the importance of an "intervening action by the employer"). McGullam testified at her deposition that she had no problem with anyone in the estimating department.
>
> Second, the sleep-over comment "had no relation to the" production department harassment. *Id.* In the production department McGullam encountered lewd and teasing comments that were about McGullam, and that were addressed to her or were made in her presence. The sleep-over comment—offensive though it may have been—was not lewd, it was not about McGullam, and it was not addressed to her or made for her to hear it. And the salesman she overheard was a member of neither the production department nor the estimating department. Moreover, for the sleep-over comment to fall within the limitations period, it must have occurred nearly one year after McGullam's transfer. Although that incident-free interval does not preclude relatedness, it renders less plausible the notion that the sleep-over comment is of a piece with the production department conduct. Given these discontinuities, we have no trouble finding insufficient relatedness.

*Id*. at 77-78.

Plaintiff makes much of a purported comment (women do not belong in hatcheries) by Assistant Manager Mel Hughes allegedly happening at the Sawtooth Hatchery in 2008. (Kane Affidavit, Dorsch Depo. Vol. I, pp.60-63). Similarly, Plaintiff takes two comments at the Magic Valley hatchery and asserts a toxic environment and systemic cultural bias. One is the "stay-at home-mom" comment that this court has already determined is not independently actionable.

The other is an alleged one-time comment, made in 2012 or 2013 at Magic Valley, purportedly made by the assistant manager Steve Kammeyer.  (Kane Affidavit, Dorsch Depo. Vol. I, pp.50-52).  Hence, Magic Valley hatchery was a toxic work environment in Plaintiff's mind.  "I left Magic Valley because it was a toxic work environment."  (Kane Affidavit, Dorsch Depo. Vol. I, p.252, ln.7-8).

In order to have an orderly trial, based upon what is actually in the Complaint and what is relevant, Plaintiff must be prevented from making statements about what happened in other hatcheries, involving other people, years before she left Springfield in 2016,  in order to invite the jury to believe that she was in a hostile work environment at Springfield.  Clearly, the Hughes and Kammeyer comments, even if true, are inadmissible in accordance with the law set forth above, as they were not part of, nor contributed to, the alleged Springfield environment nor are they "sufficiently related" to the Springfield hatchery, and involved different managers.

Similarly, the "stay-at home-mom" comment (already determined to be time barred) should not be considered relevant.  As can be discerned from the previous briefing and affidavits of Chris Jeszke in support of the motions for summary judgment, the hotly disputed actual statement, and the context therein during a series of talks, only one of which was recorded, need not go to the jury.  First, the comment, even as described by Plaintiff, is not lewd or sexually charged, teasing, or joking.  It was made by a person who had no supervisory authority over Plaintiff after the time she joined the Springfield hatchery, where Plaintiff remained for over two years.  Like the Hughes and Kammeyer comments, it was not a part of nor contributory to the Springfield environment.

### D.     Requested Rulings.

The Department requests the following rulings prior to trial: (1) Plaintiff should be ordered not to assert retaliation for any act other than the October of 2015 DNA rating; (2)

Plaintiff should be ordered not to assert disparate treatment by claiming she was treated "differently" or any similar assertion; (3)  Plaintiff should be ordered not to assert Department-wide gender bias; and (4)  Plaintiff should be prevented from presenting comments from her coworkers she claims are gender related made at any hatchery other than Springfield, specifically to include the comments allegedly made by Hughes, Kammeyer and Jeszke.

DATED this 23rd day of August, 2019.

MICHAEL KANE & ASSOCIATES, PLLC

BY:  ___/s/ *Michael J. Kane*_____
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of August, 2019, I electronically filed the foregoing document with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court's CM/ECF System for this action:

- **Chad M. Nicholson**
  nicholson@mwsslawyers.com;  white@mwsslawyers.com

- **Joseph M. Wager, Jr.**
  wager@mwsslawyers.com

- **Stephen C. Adams**
  adams@mwsslawyers.com

- **Michael J. Kane**
  mkane@ktlaw.net; tpresler@ktlaw.net

___/s/ *Michael J. Kane*_____.